Good afternoon, Your Honors. May it please the Court, Sean Hannifin, on behalf of Evanston Insurance Company, I respectfully reserve two minutes for rebuttal. Your Honors, in cases involving equitable contribution with respect to defense costs paid by multiple insurers on behalf of their common insured, California law provides that the purpose of the equitable contribution claim is to allocate the funds paid in a fashion that each insurer pays its fair share and no insurer profits at the expense of the others. That's articulated in detail in the 1998 Firearms Fund decision, which is probably the lengthiest discussion of California law on that topic. California law also provides that there's no set method for allocation, but the most commonly employed method is time on the risk, and that indeed is the method that Judge Carter indicated he was applying here. Notwithstanding his application of time on the risk, we ended up with a result where Evanston, on the risk for two years, paid $67 million, more than twice as much as Lexington, also on the risk for two years. Why? Well, Your Honor, I think it's because Judge Carter misunderstood the meaning of equitable 2012 order, in which he essentially expresses his perception of the relative equities between Evanston and, on the one hand, and Lexington and Crum and Foerster on the other. Because Evanston... I was just going to say the same thing you're going to say. Go ahead. Well, isn't it because Lexington stood up and defended under a reservation of rights and so was able to only limit its payment to reasonable fees under California state law? 2860. I think it's not 2860, Your Honor, but let me first address Justice Wardwell's question. It is because Crum and Foerster and AIG or Lexington settled first and Evanston settled last. But that was inevitable, Your Honor. In late 2007... Isn't it the fact that Lexington and the two secondary insurers defended, paid the defense costs under their duty to defend MGA and Evanston did not? They did not, Your Honor. And what is the implication of that under California law? Your Honor, that's not what occurred. The tender to all four insurers took place in late October or early November of 2007. Three insurers, including Evanston, declined coverage. Lexington merely acknowledged receipt of the complaint and took no steps to undertake defense until after MGA sued it in April 2008, some six months later. It was only after suit was filed against it that Lexington made any payments with respect to a defense that it concededly owed here. Did it do anything? It did nothing between November 1, 2007, the time of tender, and May 5, 2008, subsequent to being sued by MGA. What did it say at the time of tender? It acknowledged receipt, indicated that it would monitor the case, and made some reference to verifying that a $25,000 self-insured retention had been exhausted. When MGA filed suit in April 2008, it filed suit against Hartford, Crum and Forrester, and Lexington. It never filed suit against Evanston. Evanston declined coverage in 2007, and as far as Evanston knew, MGA wasn't challenging its coverage position. It wasn't until after MGA settled with each of Hartford, Crum and Forrester, and Lexington, garnering an approximately $52 million war chest in the process, that they turned to Evanston and filed suit against Evanston in January of 2009. So while Judge Carter repeatedly excoriates Evanston for being the last to come to the party, Evanston didn't even know the party was going on until after the litigation against the other three insurers had not only commenced, but had been resolved in favor of MGA. So you're saying that you have to, there's a requirement that you sue your insurance company for the insurance company has a duty to defend under its policy? I'm not suggesting that at all, Your Honor, but I am suggesting that with respect to the four insurers who were involved here, as a practical matter, their conduct was the same. Three denied coverage, one while not denying coverage, did not undertake the defense, which is what led to the litigation. And I'd suggest that, at least with respect to Evanston, Your Honor, we declined coverage because we had a good faith belief that our coverage did not apply. I'll leave to Lexington's counsel to explain why Lexington did not undertake the defense when it wasn't disputing that it had defense obligations. Let me just ask you a question. What happens to this litigation if we decide that Lexington's policy did not provide coverage? Your Honor, I think what should happen is that the court would resolve this allocation, this equitable contribution issue to divide the fees appropriately and in accordance with California law, and then if you decide in favor of Lexington with respect to the advertising injury issue that was just argued, I think Lexington is entitled to get a refund back from MGA with respect to the portion of the fees that were paid subsequent to the date of the filing of the Fourth Amendment Answer and Counterclaim. With respect to Judge Carter's perception of Evanston's conduct, where I think the court got it sideways was equitable contribution among insurers doesn't involve any concepts of comparative fault. It's been the law in California for more than 30 years that it's an equitable allocation of contractual obligations, and there's an uninterrupted string of cases from 1982 to the present, four of which are cited and relied upon in the Fireman's Fund decision, that say that this doesn't involve the relative equities among the insurers. This is simply an allocation of their contractual obligations. So what does the word equitable add? If it's just an allegation of contractual obligations, what does equitable mean? I think it's equitable in the sense, Your Honor, that if one insurer has borne more than its fair share of its contractual obligations, that the court should adjust them so that each insurer bears its appropriations. And how do you determine that, that somebody has paid more than? Well, Your Honor, it depends upon the allocation method chosen. In the time on the risk method, where all of the insurers have the same policy limit, we'd suggest that it's divided equally by the number of years of coverage, and I think that's the method most commonly employed by the California courts. The Centennial decision and the Fireman's Fund and the Scottsdale decisions that we cite lay out alternate schemes that are sometimes employed in circumstances where the insurers, for example, have different policy limits. If one insurer's primary policy is $1 million and another's is $2 million, you might do a two-thirds, one-third allocation and the like. But in circumstances such as are present here, where all of the primary insurers had single-year policies with the same $1 million policy limit, the allocation is simply a time on the risk allocation. Yeah. It's not washes now. I see. So I think Judge Carter approached the remaining issues from this inappropriate framework that he thought he was there to make an assessment of the relative conduct of the insurers and punish some and reward others. It seems to come through. He thought Everson was the bad guy. Absolutely, Your Honor, and Your Honor, in the Scottsdale decision, which the Court of And the Court says equitable contribution does not depend upon fault. It's based upon an equitable apportionment of contractual undertakings. And the Court further says that punishment, quote, unquote, is not a proper consideration in equitable contribution. In Judge Carter's zeal to drive toward this allocation, we think he made substantial errors of California law in at least three respects. The first is the Essex v. Heck issue that we've raised with respect to the unallocated settlement agreement. AIG and MGA entered into a settlement agreement which essentially a lump sum of $33 million was paid. That agreement doesn't allocate that consideration between the release of the defense claims with respect to which AIG could seek contribution and release of the bad faith claims, which they can't seek. Well, of course, the other side says, sure, it does. If you read it, it spells out in grotesque detail what it was all about. It had nothing to do with bad faith. It all related to the other. Your Honor, that's because they're reading the wrong portion of it. There's no doubt that the agreement contains extensive provisions with respect to calculation. But the real place to look is paragraph 13 at ER-497. And that's a paragraph that says, quote, in consideration of the payments provided for herein, close quote, and it goes on to say, MGA and Larian release the AIG companies for claims of bad faith. In other words, the agreement expressly says, in consideration of the payments provided for here, we release the bad faith claims. So Judge Carter's interpretation is not only unsupported by the agreement, it's directly contrary to what the agreement says. What AIG wishes the agreement said is, here's 33 million for defense costs and zero for bad faith or $1 for bad faith, and they could have said that, but the agreement doesn't say that. But why is the language that you just read the equivalent of that, though? Your Honor, in consideration for the payments made herein, we release bad faith claims. Okay, you're using consideration in a legal contractual sense. Well, consideration and payments, Your Honor, which are, well, yeah, and of course it is a In consideration of your apology, I won't sue you. Your Honor. There are different ways that's used, and I think it might be used in that way here. But anyway, I get your argument. But, Your Honor, the other thing to bear in mind here is You're over your time, so finish your answer. Is that the problem that the Essex v. Hecht decision contemplates is what occurred here. AIG files suit against us and says, we get credit for every single dollar paid in the settlement agreement. MGA files suit against us and say, you don't get credit for every dollar paid in that settlement agreement because the dollars paid in that settlement agreement also released our bad faith claim. In ten seconds, what are you asking us to do? We're asking you to reverse with instructions, with respect And what are the instructions? To instruct Judge Carter that the unallocated settlement agreement cannot be used as a basis for pursuit of a contribution claim, Your Honor. Thank you. Thank you, Your Honor. May it please the Court, Mark Sheridan on behalf of the AIG entities, Lexington, National Union, and Charter Specialty. Your Honor, I'll try to be brief. Ms. Kokos and I are going to split our time. She's here on behalf of Prum and Forrester. What you've just heard can be summarized in one simple sentence. No good deed goes unpunished. National Union, Charter Specialty. That's pretty much life, isn't it? That is true, Your Honor. The other side says there was no good deed. The other side sat on its hands and didn't do anything. Your Honor, what I can tell you is that Evanston breached his contract. That has been found. There's no appeal on that issue. My clients stepped up and defended their insured. What Evanston asks for here today is a dangerous precedent. They seek to punish a carrier who provided a defense by refusing to allow them to make changes. They say you didn't really step up until you were sued. Right. Your Honor, that's not stepping up. That's really more like being driven. That's actually not an accurate statement, Your Honor. Lexington has a retention, has self-insured retention. It asks for evidence proving that the self-insured retention was exhaustive. It has no obligation to defend until that is demonstrated. MGA did not provide proof of that until after the lawsuit was filed, at which point in time. So it is true. It is true that you didn't do it until you were sued. No, no. Well, it's accurate as a timeline, but you're saying that you had no obligation even though they sued you at that time. Correct. So you should answer this question. Why not? It is true, then. So, you know, I don't know why you're arguing it's not true when, in fact, it is true. It didn't happen until after you were sued. Now, there may be reasons for it, which you can talk about, but fighting the proposition just loses your credibility. It makes you seem dishonest. Where's the good deed? Yeah. The good deed, Your Honor, is several. First, once it was proven that the self-insured retention had been exhausted, Lexington not only agreed to defend, but it advanced $20 million. What did MGA have to do to show you that the self-retained insurance limit, whatever, had been used up? That the SIR, Your Honor, had been exhausted. They had to provide us with copies of the bills. So they had to do that? They had to bring you the bills? Yes. From their litigation with Mattel? Yes, Your Honor. Okay. And so once they did that, Lexington acknowledged the duty to defend, and it advanced money. Then a tender was made to the umbrella carriers by MGA, and they agreed to defend. And at that point in time, there was a dispute about the rate. What was the rate that the insurance carriers were going to defend? We asserted our rights to $2,860. The $2,860 comes in. And MGA said, we can go to arbitration or we can resolve the issue. And as Your Honor has seen in grotesque detail, Your Honor, we detailed exactly what we paid and what we paid for, and at rates that we agreed to in lieu of a $2,860 arbitration. It wasn't that we settled the lawsuit by itself. We settled the $2,860 dispute as well. And the language to which the other side refers, in consideration of? Your Honor, again, there is grotesque detail about what we paid for. To quote Your Honor, we identified every penny we paid and why we paid it. I read every number. Unfortunately, I had to draft every bit of that, Your Honor. So at the end of the day, what Evanston is seeking here is to punish my clients for having been the first to step up, having been the first to defend while they were in breach. And what they ask is not only should those carriers that defended while Evanston was in breach not be entitled to reimbursement, but that those carriers should bear the expense that Evanston incurred because it breached. So not only do we not get our money back that we paid while Evanston was in breach, but because Evanston was obligated to pay more money as a result of its breach, my clients should bear some portion of that. Your Honor, that is a dangerous precedent for this Court to set. It encourages carriers not to defend. If you are in no worse place having not defended, in fact, you might be in a better place than the defending carrier, that's what they are urging here today. And this Court should have none of it. This Court has gone a long way to encourage it. But they said they have a good-faith argument that there was no coverage. What do you do in that circumstance? Your Honor, that simply gets them out of their bad-faith claim. It doesn't mean that they didn't breach their contract. And if they believe they had such a good-faith argument, they have an obligation to reservation of rights and file a lawsuit saying we don't have a duty to defend. Did Lexington defend under a reservation of rights? It did, Your Honor. Okay. And so did the umbrella carriers as well, Your Honor. So I have nothing else at this point in time. I'd like to save some time for Ms. Kokas, unless the Court has more questions for me. Okay. Thank you. Just your bottom line is we affirm, right? I'm sorry? Your bottom line is we affirm, right? Yes, Your Honor. What if we decide that your endorsement means that you had no duty to defend? Well, two issues, Your Honor. First, we need affirmance with respect to the umbrella carriers. They should get their money back. And with respect to Lexington, if Lexington is out and had no duty to defend with respect to the post-Fourth Amendment answering counterclaim, it's entitled to reimbursement either from the other carriers or from MGA. It's perhaps easier to get it from the other carriers, but either way, it's entitled to its money back. And will that be able to be resolved without more lawsuits being filed? Your Honor, I doubt it. I do too. Thank you. Thank you. The unemployment rate might be no good in the rest of the economy, but it's pretty good around here. Go ahead. May it please the Court. Jennifer Kokos on behalf of Cremon Forrester Insurance Company. Your Honor, Evanston's entire argument that it paid more than anybody else is predicated on its inclusion of its $39 million settlement payment to MGA. That settlement payment was not part of the contribution case. That settlement agreement was not entered into until March of 2012 on the eve of trial in the contribution case. Evanston attempted to amend its counterclaim and cross-claim to include the $39 million claim, and the Court properly was within its discretion and denied that motion to amend on the grounds that it would result in prejudice to my client because the discovery cutoff date had passed, the motion cutoff date would pass, so we would have not been permitted to do any discovery with respect to this new claim. And our standard of review on that is for abuse of discretion? That's correct, Your Honor. And even Evanston itself has acknowledged that this would have been a new claim. If you compare its operative pleading, which you can find at the excerpts of record beginning on page 327, and compare that with its proposed second amended counterclaim, which begins in CNF's excerpts of record at page ER 36, you will find that they were attempting to assert two additional causes of action and multiple additional factual allegations predicated on that settlement. Again, the Court properly denied. The other issue I'd like to address briefly, Your Honors, is the Court's sua sponte granting summary judgment on Evanston's counterclaim. Again, the Court reviewed the allegations of the operative pleading and correctly concluded that it related solely to the payments made by the charges member companies and Evanston's requirement that they contribute to those payments. And in connection with that, the Court also correctly concluded that the settlement payment was not part of our case. And there were no disputed facts? No, there were no disputed facts. It was a sua sponte summary judgment based upon the fact that all of the issues that were the subject of the counterclaim were fully resolved by the member company's summary judgment ruling. If Your Honors don't have any questions, I don't have anything further. Thank you. Thank you. I think you're out of time, but we'll give you a minute for a bottle if you wish to take it. Thank you, Your Honor. Your Honor, I'd just like to speak to the last point Mr. Sheridan made, his warning to the Court that this would be a dangerous precedent. And I think he's wrong because what he's actually suggesting to the Court is that the Court endorsed a race to settlement. In other words, AIG and Crumman Forrester settle first, and they get treated better. They get an advantage over the insurers who settle later. When they settled, as I mentioned earlier, that left MGA with approximately $50 million with which to wage battle with Evanston. We paid a very substantial sum. We paid, I expect, far more than we would have paid if we had been one of the litigants back in 2008. So essentially what they're saying is the first party to settle gets cut the best deal. And there are some states in which that's the law. That's, for example, the law in Ohio. We cite one such case in our brief. But that's not the law in California. That's why California has equitable contribution among insurers. If it was a race to settle, the first insurer could cut its deal and pay a dollar. And if it cost the second insurer $10 million, you'd say to them, tough luck. It's a race to settle. And that's what equitable contribution among insurers is designed to avoid. But that's the opposite of what they're asking you to do here today. Thank you. Thank you, Your Honor. These are immensely complicated cases, including the one that's still pending. But has there been any effort to mediate or settle globally? There has, Your Honor. They've all been unsuccessful. I'm shocked. This happened in district court? Yes, Your Honor. And in private mediation as well. Private mediation as well. Okay. Well, that's certainly not the use in these cases. I thought I'd ask the question. All right. The case is argued. We'll stand submitted. Thank you, counsel.
judges: Kozinski, Trott, Wardlaw